UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

STITES & HARBISON PLLC,

    A Kentucky Professional Limited
    Liability Corporation located at
    400 West Market Street Suite 1800
    Louisville, KY 40204

        PLAINTIFF

v.

JAMES "RANDY" MICHELS, ESQ.,

    An individual residing at
    414 Woodlawn Drive, Apt. 29
    Nashville, TN  37205-2230
    randy@trust-tree.com
    randy.michels@gmail.com

WILLIAM CHARLES FERRELL JR.,  ESQ.,

    An individual residing at
    3125 Winberry Drive
    Franklin, TN  37064-6230
    bill@trust-tree.com

KEVIN HARTLEY, ESQ.,

    An individual residing at
    1409B Hawkins Street
    Nashville, TN  37203-4308
    Kevin@trust-tree.com
    kevin.p.hartley@gmail.com

&

TRUST TREE LEGAL, P.C.

    A Professional Corporation organized
    under the laws of Tennessee located
    at 1321 Adam St., Nashville, TN
    37208-1711.

        DEFENDANTS.

*ELECTRONICALLY FILED*

CIVIL ACTION NO. 3:15-cv-77-DJH

## COMPLAINT FOR INJUNCTIVE RELIEF

\* \* \* \* \*

Plaintiff Stites & Harbison PLLC ("Stites" or the "firm") by counsel, for its complaint against Defendants James "Randy" Michels, William Charles Ferrell Jr., Kevin Hartley, and Trust Tree Legal, P.C., states as follows:

## NATURE OF ACTION

1.      This is an action is for breach of fiduciary duty, aiding and abetting breach of fiduciary duty, trademark infringement and unfair competition under the Lanham Act, Kentucky law trademark infringement and unfair competition, tortious interference, conversion, and civil conspiracy against three lawyers who, while holding themselves out as fiduciaries and loyal agents of Stites & Harbison PLLC, knowingly and deceptively took actions against the interests of the firm, set up a competing enterprise named Trust Tree Legal P.C., and then conspired to misappropriate social media accounts and intellectual property from Stites upon their departure from the firm.

2.      Stites is a full-service law firm that represents clients across the United States with offices located in Louisville, Kentucky and Nashville, Tennessee, among other locations.  Stites advertises, including via the Internet, and offers legal services to clients under the marks STITES & HARBISON, PLLC,  TRADEMARKOLOGY, and the Bow-Tie Fleur de Lis Design ("Stites trademarks").  During the relevant period, Defendants Michels and Ferrell were members of the firm and defendant Hartley was an associate of the firm.

3.      As members of and as an associate with Stites, defendants Michels, Ferrell and Hartley owed Stites and all of its other members fiduciary duties, which included the duty of loyalty, the duty to act with the utmost good faith, the duty to always act in the best interest of Stites and its

other members, and the duty not to use for Michels, Ferrell's or Hartley's benefit any proprietary, trademark, or other confidential information that was obtained while a member of Stites or that is owed by Stites.   These fiduciaries duties owed by defendants Michels, Ferrell and Hartley to Stites and the other members of Stites survived the termination of defendants Michels, Ferrell and Harley's employment with Stites  and continue to the present day.  As set forth below, defendants Michels, Ferrell and Hartley breached their fiduciary duties to Stites.

4.      Before departing the firm, the three lawyers named as defendants in this action collected substantial compensation and reimbursement from Stites under the false pretense that they were undertaking activities for the exclusive benefit of Stites.

5.      Before departing Stites, one or more defendants deleted emails and electronic documents from their work computers and email accounts about the activity.   Recovered electronic documents indicate that before departing Stites, and over a period of months, the lawyers had already begun work on the competing entity.  Before their departure, the attorneys entered into service and marketing agreements to prepare and promote the competing enterprise.  The lawyers began meeting outside the office and communicating on personal email accounts about forming the competing enterprise.  The entity was incorporated on December 9, 2014, nearly a month before two of the defendants departed Stites.

6.      Immediately before departing, and while still a member and fiduciary of Stites, defendant Michels, in coordination with the other defendants, misappropriated five social media accounts belonging to the firm by changing the administrator access, login credentials, and passwords. The accounts were on Facebook, Twitter, Instagram, Pinterest, and Google+.  When confronted by the Chairman of Stites about the misconduct, defendants refused to take corrective action or surrender control of the accounts.

7.     The social media accounts were branded and linked to a professional trademark blog owned and operated by Stites since 2013 called Trademarkology™, which advertised the services of Stites. (*See* www.trademarkologist.com). The social media accounts promoted the Trademarkology™ blog and disseminated its content.  Stites advertised legal services using  the Trademarkology™ blog and the social media accounts.  Attorneys within the firm, including the defendants, were paid for creating content for the blog and social media accounts.  The blogs and social media accounts contain copyrighted material owned by Stites.  Stites paid third-party service-providers to maintain and promote the blog and social media accounts.  Stites marketed the blog and social media accounts to clients of Stites.  The social media accounts contained hundreds of "followers" or other connections to clients and potential clients of Stites.  In late 2014, the blog was voted by the ABA Journal as one of the top 13 law blogs in the country.

8.     After defendants misappropriated control of the social media accounts, they changed the contact information that was on file with the social media service providers for each account from the firm's email address trademarks@stites.com to email addresses set up for the defendants' new company (e.g. info@Trust-Tree.com).  Defendants locked out Stites attorneys and staff from control of the social media profiles by changing administrator access on the accounts.  Defendants then altered the name and publically-visible profiles for the accounts so that the accounts promoted *Trust Tree Legal* instead of *Trademarkology™* and *Stites & Harbison PLLC®*.  As a result of the misappropriation and unauthorized changes, hundreds of followers and contacts associated with the Stites accounts previously "following" the firm were transferred to pages promoting the defendants' new directly competing enterprise.  The original addresses for several of the Stites *Trademarkology™* social media accounts are now dead or unavailable.

9.      With respect to the Facebook account, defendants changed the URL address of the account from www.facebook.com/Trademarkology to www.facebook.com/TrustTreeTrademark, but did not change the name and visible profile associated with the commercial Facebook page. As a result, the page continues to display the *Trademarkology™* trademark and incorporates other Stites trademarks, as set forth below.   Defendants changed the email contact for the Facebook site to info@Trust-Tree.com, thus directing clients and potential clients who visit the Facebook site to the competing entity.   This deceptive use and infringement of Stites trademarks has resulted in a substantial likelihood of confusion and risks irreparable harm to Stites's brand, business, goodwill, and customer relationships.

10.     These actions constitute breaches of fiduciary duty that have harmed and continue to harm the firm's goodwill and client relationships.

11.     Stites seeks injunctive relief (1) compelling return of control of the social media accounts, (2) compelling return of the accounts to their original display content and web addresses, (3) prohibiting defendants from further unauthorized access or use of the accounts, (4) prohibiting continued use of the Stites trademarks and other intellectual property.

12.     Two of the four defendants are subject to dispute resolution obligations under the operating agreement of Stites.   Stites therefore requests temporary and preliminary injunctive relief during the period of dispute resolution.

13.     Stites seeks judgment in this Court for permanent injunctive relief against Defendants. And, to the extent that alternative dispute resolution among all parties fails, is not agreed upon, or is waived by the parties, Stites reserves its right to seek additional relief against Defendants.

## PARTIES

14.   Plaintiff Stites is a Professional Limited and Liability Corporation organized under the laws of Kentucky with its principal office located in Louisville, Kentucky.

15.   Defendant Michels joined the firm's Nashville office in 2001 and was later elected to membership.  He resides in Nashville, Tennessee.

16.   Defendant Ferrell joined the firm's Louisville office in 2005 and was elected to membership to the firm in 2012.  After joining the firm, he transferred to the Nashville office. He resides in Franklin, Tennessee.

17.   Defendant Hartley joined the firm as an associate attorney in 2010.  He resides in Nashville, Tennessee.

18.   Defendant Trust Tree Legal, P.C., is a Professional Corporation organized under the laws of Tennessee on December 9, 2014, with a principal office located at 1321 Adam St., Nashville, Tennessee 37208-1711.

## JURISDICTION AND VENUE

19.   This Court has original jurisdiction to adjudicate the Lanham Act claims in this action pursuant to 15 U.S.C. § 1121 and 28 U.S.C. §§ 1331 and 1338, and has pendent jurisdiction to adjudicate the remaining claims pursuant to 28 U.S.C. § 1338.  This Court also has supplemental jurisdiction under 28 U.S.C. § 1367 over the state law claims.

20.   Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391.  Defendants Michels (member), Ferrell (member), and Hartley (associate) held themselves out as loyal agents of Stites, which is located in this District.  The intellectual property at issue in this case was owned by Stites in this District.  The unlawful acts by defendants were directed at Stites, which is located in this District.  Pursuant to the firm's operating agreement, Kentucky law applies.

Defendant Trust Tree Legal, P.C. is an entity created and controlled by the individual defendants. Given their substantial contacts with this District, the individual defendants and their entity are subject to personal jurisdiction in this District.

## FACTS

### Creation and ownership of the Trademarkology™ blog and social media accounts

21.    Defendants Michels, Ferrell, and Hartley were attorneys practicing in Stites's intellectual property group during the relevant period.

22.    In September 2013, defendants Michels and Ferrell made a proposal to Stites management about launching a blog, at the firm's expense, to promote the firm's trademark practice.

23.    Section 9.15.1 of the firm's Professional Practice Manual, titled "Online Networking Policy," contains requirements for attorneys wishing to use firm technology, time, resources, brands, and intellectual property to advertise or promote firm services or capabilities.  (*See* **Exhibit A**).

24.    The "Online Networking Policy" mandates that no personal blogs or social media accounts may be maintained or created using the firm's IT network:

> [N]o S&H attorney or employee shall create personal blogs using the S&H IT network.  The Firm's IT network or internet website will not be available for participation in any personal online networking nor operation of a personal blog. . . .  If a lawyer maintains a personal blog on a non-S&H IT system, such as a home computer, the lawyer should not provide legal advice or counsel.  Material published on a personal blog should never be attributed to S&H and should not appear to be endorsed by or originated from S&H.

(*Id.*)

25.    For promotional and Stites-associated blogs and social media accounts, the "Online Networking Policy" requires advance management approval.

26.     On September 16, 2013, defendants Michels and Ferrell submitted an application pursuant to Section 9.15.1 of the firm's Professional Practice Manual seeking approval from Stites management for a trademark-themed blog identified as:

**STITES & HARBISON, PLLC
TRADEMARKOLOGY BLOG**
Proposal, Review and Authorization

 (*See* **Exhibit B**).

27.     The application indicated that six Stites attorneys were anticipated to participate in the blog on behalf of the firm:

**Attorneys to Contribute to Blog:** The primary contributors will be Randy Michels, Bill Ferrell, Kevin Hartley, and Mari-Elise Taube.  We also anticipate contributions from Melissa Smith and Jennifer Kovalcik.

(*Id.*)

28.     The application sought funding from Stites for the blog and stated that its purpose would be to promote Stites's brand and services:

**How will you use the Blog to benefit the Firm?**    The blog will raise the profile of the firm in the branding, marketing, and trademark communities, especially in Nashville. This will enhance the firm's reputation as having expertise in trademark law and related intellectual property, which should generate new business opportunities.

(*Id.*)

29.     Stites management approved the *Trademarkology*™ blog, which was then launched in November 2013 at the firm's expense.  The original content of the blog was housed at the registered domain name www.trademarkologist.com, and was cross-linked with www.stites.com.

30.    The blog website ([www.trademarkologist.com](http://www.trademarkologist.com)) repeatedly identified its affiliation with

Stites, including in the blog header as shown in the following screenshots:





31.    The STITES & HARBISON PLLC® mark is the subject of U.S. Registration Nos.

4,134,867 and 4,131,948 issued in 2012 for use in connection with legal services.

32.    TRADEMARKOLOGY™ and the Bow-Tie Fleur de Lis  design (collectively the "Stites

Trademarkology™ Marks") are service marks that have been in continuous and extensive

commercial use in connection with Stites's services since November 2013.  Stites has filed a

federal trademark application seeking registration for TRADEMARKOLOGY™ (Application

Serial Number 86/470,095) for use in connection with online journals.

33.    Since November 2013, the "About" section of the Trademarkology™ blog indicated that

it was advertising the services of Stites:

## About

THIS IS AN ADVERTISEMENT

Stites & Harbison is a large and very, very old Southeastern law firm. How old? It traces its roots to the 1832 establishment of a law firm by Judge Henry Pirtle and James Speed, who later served as Attorney General for Abraham Lincoln.

One or two important things have happened in this country since 1832. For instance, Stites & Harbison has become one of the top trademark firms in the country. Also, someone invented blogs. The goal of this blog, Trademarkology, is to help you select a brand name or logo by providing insight on how others have selected and protected their brands. We also hope to convince you of the power and value of obtaining federal trademark registration for all your brand names. We'd also like to make you chuckle a few times, because come on, this is trademark law. We're sure ol' Judge Pirtle would be quite proud.

All pleasantries aside, we are lawyers and therefore cannot resist telling you about how smart we are and how much we've accomplished. So, here goes:

(www.trademarkologist.com/about/).

34. At all times relevant hereto, the "Services" section of the Trademarkology™ blog promoted the services of Stites:

Now for some horn tooting: Trademarkology is powered by the **Stites & Harbison** law firm, which is ranked as a National Tier 1 law firm in Trademark Law by *U.S. News & World Report* and *Best Lawyers* in the 2014 edition of the "Best Law Firms."  Stites & Harbison is also listed among the Top Trademark Firms in the United States by *Intellectual Property Today* (May 2013 issue) with respect to the number of trademark registrations issued in 2012. Pretty impressive, eh?

(www.trademarkologist.com/trademark-services/).

35. Stites owns rights arising under copyright law in the content of the Trademarkology™ blog, and included formal copyright notice of its rights on every page of the blog:

Copyright © 2014, Stites & Harbison, PLLC. All Rights Reserved.

36. Stites paid start-up and yearly fees to LexBlog (www.lexblog.com) to host the Trademarkology™ blog.  Stites attorneys posted original content to the blog using login and administrator credentials issued to Stites through LexBlog.

37.     Stites paid a subscription service called Mondaq to republish Trademarkology™ blog content in order to reach as many Stites clients and prospective clients as possible:



(available at www.modaq.com.)

38.     The Trademarkology™ blog was linked to multiple associated social media accounts that republished and disseminated the blog content.  These social media accounts were:

•       Facebook (www.facebook.com/trademarkology);

•       Twitter (www.twitter.com/trademarkology);

•       Google+ (https://plus.google.com/+Trademarkologistlaw);

•       Pinterest (https://www.pinterest.com/trademarkology/); and

•       Instagram (http://instagram.com/trademarkology).

39.     The publically available contact email for these social media accounts was trademarks@stites.com.   The physical address associated with these accounts was 401 Commerce Street, Suite 800 Nashville, Tennessee 37219.   This address is the Nashville office of Stites.

40.     Defendants Michels, Ferrell, and Hartley shared varying degrees of administrator access to the social media accounts.  The marketing department of Stites and another Stites attorney, Mari-Elise Taube, also had varying degrees of administrator access and privileges.

41.     Badges or icons were included on the Trademarkology™ blog directing consumers to the associated Trademarkology™ social media accounts.



(Screenshot of www.trademarkologist.com from December 23, 2014, available at the Wayback Machine Internet Archive http://archive.org/web/web.php).

42.     The Twitter feed for the Trademarkology™ Twitter account continuously posted in the right hand column of the Trademarkology™ blog as shown in the following screenshot:



(Screenshot of www.trademarkologist.com from December 23, 2014, available at the Wayback

Machine Internet Archive http://archive.org/web/web.php).

43.     The social media accounts for the Trademarkology™ blog promoted the services of Stites

and contained repeated uses of Stites trademarks, such as:



 (from Facebook).

44.     Stites's marketing department promoted the Trademarkology™ blog to Stites clients, and

encouraged clients to "follow" or "like" the blog and the associated social media accounts.

45.     Stites paid for a service from HootSuite (www.hootsuite.com) that pushed content from the Trademarkology™ blog to the associated social media accounts in order to reach as many Stites clients and prospective clients as possible:.

46.     Defendant Michels sought and received approval for the HootSuite service from the leader of the firm's Intellectual Property service group, David Nagle, after sending the email below:

---

**From:** Michels, James R.
**Sent:** Monday, April 21, 2014 8:57 AM
**To:** Nagle, David
**Cc:** Ferrell, William
**Subject:** FW: HootSuite - Payment Invoice

David,

Bill and I use HootSuite to schedule our Trademarkology tweets. We upgraded to the "pro" version last month so we could attach images to our tweets in Twitter format. This has definitely improved our performance on Twitter as we now have over 200 followers.

Our free trial just expired, and we are now paying $9.99 per month for the subscription. Can I turn this is as a reimbursable expense?

Thanks!

Randy

---

47.     Defendant Michels justified the HootSuite service as a firm expense because it was successfully increasing the Twitter followers for the Stites Trademarkology™ Twitter account.

48.     Defendants Michels, Ferrell, and Hartley, along with Stites attorney Mari-Elise Taube and the occasional guest blogger posted a blog post approximately every business day through November 2014.

49.     On January 7, 2015, the Trademarkology™ blog was recognized by the ABA Journal as the top intellectual property law blog in the country and one of the 13 best overall blogs in the country.

50.     As a result of Stites's continuous investment in the Trademarkology™ blog, the Stites trademarks and the Trademarkology™ blog became well-known among clients and potential clients as the source of trademark-related legal information and services.

**The compensation and resignations of defendants Michels, Ferrell, and Hartley**

51.     Stites compensated attorneys, including defendants Michels, Ferrell, and Hartley, for their work in posting content on the Trademarkology™ blog.

52.     Stites created an internal billing code (ZZ997 FIRM AND NEW BUSINESS DEVELOPMENT: 140809 TRADEMARKOLOGY) for attorneys to account for "firm investment time" associated with the Trademarkology™ blog and social media accounts.  Credit associated with "firm investment time" is a factor considered for evaluation of performance and compensation at the firm.

53.     From November 2013 through their departure, defendants Michels, Ferrell, and Hartley made hundreds of entries into the firm's time management system claiming that they were drafting blog posts and distributing the posts on the associated social media accounts for purposes of promoting the firm and developing firm business.  Below are examples such time entries:





54.    For defendants Michels and Ferrell, the majority of their accounted for time at Stites in the calendar year 2014 was devoted to activities related to the Trademarkology™ blog and social media accounts.

55.    The time spent by defendants Michels and Ferrell on the Trademarkology™ blog and social media accounts was to the to the exclusion of billable work.

56.    Defendant Michels finished 2014 with 531 billable hours (1119 hours below his billable hour target), with 1432 non-billable "firm investment hours" predominately related to the Trademarkology™ blog and social media accounts.

57.     Defendant Ferrell finished 2014 with 521 billable hours (1129 hours below his billable hour target), with 944 non-billable "firm investment hours" predominately related to the Trademarkology™ blog and social media accounts.

58.    Defendant Hartley was also substantially below his billable hour target in 2014, while logging substantial non-billable "firm investment hours" in 2014 predominately related to the Trademarkology™ blog and social media accounts.

59.    Defendants Michels, Ferrell, and Hartley wrote in self-evaluations to firm management that their compensation from Stites was justified because of the substantial work they performed in promoting the Stites brand and web presence through the Trademarkology™ blog and associated social media accounts.

60.     In 2014, Stites collectively paid Defendants Michels, Ferrell, and Hartley approximately $500,000 in salary/compensation, plus benefits, reimbursed expenses, and associated overhead.

61.     Stites sustained a financial loss with respect to the individual defendants Michels, Ferrell, and Hartley in 2014 as a result of their underperformance on billable work.

62.     In September 2014, Defendants Michels, Ferrell, and Hartley made a proposal to Stites management seeking additional funds to construct a web-based trademark application portal to be added to the Trademarkology™ blog.  The proposed web-portal would offer a user-imputed form-based service to file trademark applications for a flat fee in a business model similar to that offered by Legal Zoom (www.legalzoom.com).

63.     On November 17, 2014, Stites management declined to fund the web portal addition to the Trademarkology™ blog.

64.     In mid-November 2014, defendant Hartley announced his resignation from Stites, effective at the end of the month.

65.     Upon resignation, defendant Hartley told attorneys and staff at Stites that he intended to pursue a business in real estate.

66.     Stites management amicably welcomed the resignation, and wished defendant Hartley success in his new endeavor.

67.     On December 1, 2014, defendant Ferrell announced his resignation from Stites, effective December 31, 2014.

68.     Upon resignation, defendant Ferrell announced his intent to set up his own practice based on a web-portal for trademark applications—the business model that the firm declined to support.

69.     Stites management amicably welcomed the resignation, and wished defendant Ferrell success in the new endeavor.

70.     Defendant Ferrell assured Stites attorneys and the marketing department that he would not attempt to continue using the Stites Trademarkology™ Marks or blog.

71.     The firm's Trademarkology™ blog continued after the resignations of defendants Ferrell and Hartley, with Mari-Elise Taube and defendant Michels continuing to post content.

72.     In December 2014, the Stites marketing department oversaw the removal of the bios of defendants Hartley and Ferrell from the blog.

73.     On January 1, 2015, Defendant Michels announced his resignation from the firm via email to Ken Sagan and Bob Connolly.  The email stated:  "Bob and Ken, Pursuant to section 5.2.1 of the Stites & Harbison Amended and Restated Operating Agreement, this email serves as notice to the Members of my voluntary and permanent withdrawal from Membership at the end of January 2015.  It will probably come as no surprise that I am going to work with Bill Ferrell on creating a web portal to deliver trademark services online.  I want to thank you for all your support over the last 13.5 years, and I hope that we can continue to work together in the future."

74.     Stites management amicably welcomed the resignation, and wished defendant Michels success in the new endeavor.

75.     After Defendant Michels announced his resignation, the remaining Trademarkology™ blogger, Mari-Elise Taube and the Stites marketing department began efforts to transition the blog administration to other attorneys in the firm.   Taube and the Stites marketing department sought the assistance of defendant Michels in the process.

**Defendant Michels hijacks Trademarkology™ accounts upon departure**

76. On January 2, 2015, Stites management and defendant Michels reached an amicable agreement to accelerate his departure, effective January 7, 2015. Pursuant to the terms of the letter agreement (attached as **Exhibit C),** defendant Michels agreed, among other things, to facilitate smooth transition of his work and return all firm property. In exchange, Stites agreed to accelerate final payments to him from the firm.

77. Defendant Michels received a copy of this executed letter agreement from Stites Chairman Robert M. Connolly on January 2, 2015 at 5:07 pm EST. By that time, Defendant Michels had already arranged through separate email correspondence with the firm's accounting department to confirm direct deposit of substantially all his remaining compensation from Stites into his bank account.

78. At 12:06 am EST the morning of Saturday, January 3, 2015, Defendant Michels or somebody acting on his behalf changed the password to the Trademarkology™ Twitter account.

79. Twitter sent the following notification to the Stites Trademarkology™ email account:



80.   On or before Saturday, January 3, 2015, defendant Michels and/or others acting in concert accessed the Trademarkology™ LexBlog account and added links to biographical information for defendants Hartley and Ferrell in connection with the Trademarkology™ blog.

81.   Stites's marketing department contacted LexBlog and was ultimately able to reverse the changes that defendant Michels made to the Trademarkology™ blog through the firm's LexBlog account.

82.   Over the next three days before his final departure date of January 7, 2015, defendant Michels and/or the other defendants acting in concert, changed the passwords for the Trademarkology™ social media accounts.

83.    For example, on January 6, defendant Michels and/or the other defendants acting in concert changed the password for the Trademarkology™ Instagram account, as indicated in the following email received at trademarks@stites.com:



84.    After defendants changed the passwords for the Trademarkology™ social media accounts, and before defendant Michels's last day at the firm, defendants removed all administrator privileges or control previously held by attorney Mari-Elise Taube and the Stites marketing department.

85.    After defendants changed the administrator controls for the Trademarkology™ social media accounts, and before defendant Michels's last day at the firm, defendants changed the administrator email addresses linked to each account from trademarks@stites.com to one or more associated with the domain "@trust-tree.com." For example, the notification email below from Instagram indicates that the associated email for the Trademarkology™ Instagram account was changed from trademarks@stites.com to bill@trust-tree.com:



86.     After defendants changed the administrator credentials and associated emails for the Trademarkology™ social media accounts, and before defendant Michels's last day at Stites, defendants changed the name and web address of the accounts as follows:

| BEFORE | AFTER |
| --- | --- |
| www.facebook.com/trademarkology | www.facebook.com/TrustTreeTrademarks |
| www.twitter.com/trademarkology | https://twitter.com/trusttreepc |
| www.instagram.com/trademarkology | http://instagram.com/trusttreetrademarks/ |

87.     As of the filing of this Complaint, Stites has been unable to determine how defendants altered the Google+ and Pinterest accounts.

88.     According to the Tennessee Secretary of State, Trust Tree Legal, P.C., was incorporated by defendant Hartley on December 9, 2014, with a principal office located at 1321 Adam St., Nashville, Tennessee 37208-1711.

89.     By altering each of the social media accounts in the manners described, defendants transferred all followers, "likes", contacts, firm client affiliations, and blog content from the

Trademarkology™ social media accounts to accounts promoting the new entity Trust Tree Legal. As a result, consumers and potential consumers looking for the Stites Trademarkology™ blog and those "following" or "liking" the blogs through associated media accounts were effectively redirected to the competing newly-formed Trust Tree Legal entity.

90.     Before defendant Michels's last day at Stites, defendants changed the publically visible profiles and displays for each of the Trademarkology™ social media accounts. Defendants changed the external contact information for each account from trademarks@stites.com to info@Trust-Tree.com.   Defendants changed the physical address for the accounts from the address of Stites's Nashville office to 1321 Adam St., Nashville, Tennessee 37208—the principal office of Trust Tree Legal P.C.

91.     After defendants renamed the Trademarkology™ social media accounts and changed the domain names, the prior domain names for the Trademarkology™ social media accounts became dead links, as shown in the following screenshots taken on January 12, 2014:







92.     Before defendant Michels left the firm, defendants altered the appearance of the
Trademarkology marks on the Trademarkology™ Twitter account to display commercial

indicators associated with Trust Tree Legal, thus converting every individual post, update, tweet, retweet, favorite, as well as all blog content from Stites's Trademarkology™ Twitter account to appear as if they are promoting or endorsing Trust Tree Legal.

93.     The screenshot below illustrates the profile display of the Stites's Trademarkology™ Twitter account after the defendants changed the graphics and name:



94.     After the changes, a Twitter user who previously "followed" Stites's Trademarkology™ Twitter account or "favorited" a Trademarkology™ blog entry would automatically be "following" or "favoriting" something seemingly associated with the new Trust Tree entity without the consent or advance notice to the Twitter users, which include clients and potential clients of Stites.

95.      For example, on November 3, 2014, Stites attorney Mari-Elise Taube authored and posted the following original content on the Trademarkology™ blog and associated social media accounts, inviting readers to like or follow the entry on social media:



(www.trademarkologist.com/2014/11/episode-ii-the-empire-brewing-strikes-back/#more-4467).

96.     After the hijacking of the Stites Trademarkology™ Twitter account by defendants, Mari-Elise Taube's November 3, 2014 blog post appears as if it were posted by TrustTreePC on November 3, 2014, when it was not.



(available at www.twitter.com/trusttreepc on January 12, 2015).  Any "retweets" of the Taube post now link back to a Twitter account that promotes Trust Tree Legal instead of Stites, even though Stites owns the social media account where the blog post originally appeared and owns the copyright rights in the blog post content.

97.     The Stites marketing department throughout 2014 promoted the Trademarkology™ blog and Twitter account by, among other things, retweeting the Trademarkology™ Twitter posts to the firm's general Twitter account @StitesLaw.  By hijacking and altering the Trademarkology™ Twitter account, the prior retweets of Tradmarkology™ content at the @StitesLaw twitter account became visibly linked and attributed to the TrustTreePC twitter handle and graphics. This gave the appearance that Stites was the source of, sponsored, or endorsed the services of TrustTreePC among Stites's own clients and followers.

98.     The following screenshots were taken from the @StitesLaw Twitter account on January

14, 2015 at 8:56 am:



99.     With respect to the Stites Trademarkology™ Facebook account, the defendants continued

to display the Stites trademarks and the page continues to use those marks throughout, but the

defendants changed the domain name and contact information for the account to direct

consumers to their competing entity Trust Tree Legal, P.C. and the individual defendants

continued to display the Stites trademarks and the page continues to use those marks throughout.

100.    These screenshots were taken at 10:51 pm EST on January 12, 2015, from the

Trademarkology™ Facebook page after the defendants altered the page:





101.    Any Facebook user who was previously linked to the Stites Trademarkology™ Facebook account would now be linked to a site that, while still giving the appearance of being associated with the Stites Trademarkology™ blog, directs viewers to the contact information and address of the competing entity, Trust Tree Legal.

102.    The hijacked Facebook account is now a vehicle for false and deceptive advertising that creates a substantial likelihood of confusing consumers. The hijacked Facebook account also contains multiple instances of infringement of the Stites trademarks .

103.    The Stites Trademarkology™ social media accounts contained posts, cached content, metatags, key words, and other embedded content that use or refer to the Stites trademarks including the STITES & HARBISON PLLC® mark.  This content remained within or associated with the Stites Trademarkology™ social media accounts after they were hijacked.  As a result, consumers who search for  Stites's Trademarkology™ Marks and STITES & HARBISON PLLC® on various search engines will be directed to Trust Tree links.

104.    The following is a screenshot taken from the Twitter search page on January 14, 2014 after performing a search for the term "trademarkology":



105.    The following screenshots were taken from www.google.com on January 14, 2015 after performing a search for the phrase "trademarkology twitter":





106.   Clicking on the above link that prominently includes the Tradmarkology™ mark directs consumers who are looking for the Stites Trademarkology™ Twitter account to the hijacked Trademarkology™ Twitter account, which now promotes Trust Tree PC.   The following screenshot was taken after clicking on the above search result:

107.   On January 6, 2015, Stites Chairman Robert M. Connolly emailed a cease and desist letter to defendant Michels, informing that he was in breach of his fiduciary duties and the terms of the withdrawal agreement, and further demanding that he immediately return the login credentials and passwords for the Stites Trademarkology™ social media accounts.   (*See* Letter attached as **Exhibit D**).

108.    Defendant Michels, still a member of Stites, responded by email on January 6, 2015 as

follows:

> Bob,
>
> This responds to your letter below.
>
> I disagree with the contentions raised in your letter. In particular, I
> did not alter the administrator settings for the Trademarkology
> blog.
>
> I have to admit to being thoroughly confused why the firm is
> taking such an interest in Trademarkology after the management
> committee rejected our proposal. That being said, it has never been
> our intention to take Trademarkology with us. To that end, the
> various social media accounts have been rebranded as "Trust
> Tree". The firm retains possession of the blog and all our blog
> posts. The firm is also free to register new social media accounts
> using the Trademarkology name.
>
> I trust that this resolves any lingering concerns that you have. If
> not, then I would be happy to meet with you during your next trip
> to Nashville.
>
> Randy
>
> Randy Michels
>
> 615.500.3264 | randy.michels@gmail.com
>
> @TrustTreePC

109.    The signature line of email response above, sent while still a member of Stites, contained

a hyperlink (@TrustTreePC) to the Trademarkology™ Twitter account that defendants had just

converted.

110.    Stites Attorney Mari-Elise Taube communicated with defendant Hartley, and requested

that he return control of the Stites Trademarkology™  social media accounts to Stites.

Defendant Hartley declined, claiming that the accounts were personal accounts belonging to

defendants.  This position that the Trademarkology™ social media accounts were "personal"

accounts belonging to defendants is indefensible.

111.    The Trademarkology™ social media accounts were created and maintained on firm time using firm IT networks to promote and advertise Stites.

112.    The individual names of the defendants were not identified as the holders of the Trademarkology™ social media profiles associated with the social media accounts.

113.    The individual defendants have other "personal" social media accounts, which identify themselves personally in the profiles and use personal contact emails.  Those personal accounts are not at issue in this case.  Only the five Trademarkology™ social media accounts are at issue.

114.    Taking the position that these accounts were personal would violate Stites's "Online Networking Policy."   When defendants Michels and Ferrell sought approval of the Trademarkology™  blog from firm management, they pitched the blog and social media accounts as raising the web-profile of the firm and providing a sub-brand for the firm.  The Trademarkology™  blog was approved by Stites, and the firm paid the fees associated with it.

115.    There is a Stites billing code associated with the blog and social media.  Defendants, as well as other Stites attorneys billed substantial time to that code.  Defendants received over half a million dollars in compensation and benefits from Stites during the time defendants used firm time and resources to promote these social media accounts.

116.    The firm marketed the Trademarkology™ blog and social media accounts to firm clients, primarily to clients not associated with defendants.  These social media accounts were, as the blog says, "Powered by Stites & Harbison."  Defendants locked out the administrator controls of a current Stites attorney and the Stites marketing department in order to hijack the accounts.  The Trademarkology™ website contained multiple links to the social media accounts, encouraging readers to like or follow the accounts.   The copyright in all blog content was and is owned by

Stites & Harbison PLLC.  The Stites Trademarkology™ Marks and Stites & Harbison PLLC®
marks appeared in social media profile pages repeatedly.

117.    The firm's operating agreement, as well as fiduciary duties under the law of Kentucky,
require that Stites members must devote all their work-related time to benefit the firm.
Moonlighting is not permitted.  By taking the position that the Trademarkology™ social media
accounts were "personal accounts," defendants are taking a position that admits breach of
fiduciary duties owed to the firm.  If these were personal accounts, then the firm was misled for
over a year in compensating defendants for the substantial "firm investment time" that
defendants claimed in connection with those social media accounts.  By taking the position that
the Trademarkology™ social media accounts are personal, defendants are conceding that they
spent the majority of their "firm investment time" working to benefit themselves and their new
competing entity instead of working to benefit Stites.

118.    Prior to his departure, defendant Michels refused to turn over the hijacked social media
accounts, and the Trust Tree entity began making new posts to those accounts.

119.    Efforts to recover the accounts through the host entities are ongoing.

120.    On or about January 13, 2015, the domain name www.trusttreetrademarks.com became
active.  That page contains links to what was previously the Stites Trademarkology™ Twitter
account.  Below is a screenshot from that page taken January 13, 2015:



**Investigation and discovery of defendants' pre-departure conduct**

121.    After the actions of defendant Michels, Stites management began an investigation of the activities of the three individual defendants while at the firm.   The following facts were revealed by that investigation.

122.    Defendants, acting in concert, planned and made preparations to launch the Trust Tree entity months before they left Stites.

123.    Before departing Stites, and over a period of months, one or more of the defendants deleted emails and electronic documents from their work computers and email accounts relating to their activity in setting up and preparing to launch the Trust Tree entity.

124.    Email documents indicate that before departing Stites, and over a period of months, the lawyers began meeting outside the office and communicating on personal email accounts about forming the competing enterprise.

125.    Before their departures from Stites, the individual defendants entered into service and marketing agreements to prepare and promote the new "Trust Tree" entity. These activities were not undertaken with the consent or approval of the firm.

126.    Defendants Michels, Ferrell, and Hartley scheduled a meeting at the house of defendant Hartley on the morning of Thursday October 9, 2014 to discuss plans and preparations for the "Trust Tree" business.   The meeting was scheduled to include Eliza Brock of Eliza Brock Software LLC and Holly Stewart, a web and graphic design planner for an entity called Lambworks.

127.    Defendants Michels, Ferrell, and Hartley scheduled another meeting with Eliza Brock and Holly Stewart to occur on October 14, 2014.   The meeting was scheduled to occur at the house of defendant Hartley.

128.    On October 27 2014, defendant Michels forwarded an email chain from his Stites email account to one of his personal email accounts with a subject line referencing "***1/1/15 \*trust tree***."  The email chain corresponded with an account manager at LexBlog.  At some point before his departure from Stites, defendant Michels deleted this email chain from the inbox of his Stites email account through Microsoft Outlook.  After this deletion, defendant Michels did not delete or empty his entire "deleted items" folder in his Stites Microsoft Outlook account.  Rather, he selectively "double-deleted" the individual emails from this chain in his deleted items folder. Defendant Michels failed, however, to delete the email whereby he forwarded this chain to his personal account.  Screenshots of portions of the email chain are set forth below:



129.    On October 27,  2014, defendant Michels forwarded an email chain from his Stites to his

personal account with a subject line "***Try out TrademarkNow *Trust Tree >tomorrow***

***#11/30/14***."  The chain referenced an account defendant Michels created with a service provider

called TrademarkNow®.  Sometime before he departed the firm, defendant Michels deleted this email chain from both his Microsoft Outlook inbox and "deleted items" folder.  Defendant Michels failed, however, to delete the email whereby he forwarded this chain to his personal account.  Screenshots of portions of the email chain are set forth below:



130.    On October 27, 2014, defendant Michels sent an email from his gmail account to Eliza Brock.  The email stated that "[w]e want to launch the website in the next 4-6 weeks."  The signature line for the email lists defendant Michels's personal phone number and gmail address, along with the addresses for the Trademarkology™ blog and Twitter account.  A screenshot of a portion of this email chain is set forth below:

> On Mon, Oct 27, 2014 at 1:49 PM, Randy Michels <randy.michels@gmail.com> wrote:
>
> Eliza,
>
> I want to follow up on the email below.
>
> We are generally available to meet with you this Sunday (or anytime during this work week). Please let us know what works best for you.
>
> We're starting to get nervous about timing. We want to launch the website in the next 4-6 weeks. Is this possible with your busy schedule?
>
> Thanks!
>
> Randy
>
> Randy Michels
> 615.500.3264 | randy.michels@gmail.com
> https://www.linkedin.com/in/randymichels
> http://www.trademarkologist.com | https://twitter.com/Trademarkology

131.     On November 11, 2014, defendant Michels received an email on his Stites account from Eliza Brock Software, LLC.  Later that day, defendant Michels forwarded the Eliza Brock Software email to his personal account at randy.michels@gmail.com.  The Eliza Brock Software email attached an invoice for "Project Planning and Wireframing for Trust Tree."  The invoice was addressed to the personal residence of defendant Michels.   Sometime before he departed the firm, defendant Michels deleted this email chain from his Microsoft Outlook inbox, sent box, and "deleted items" folder.  Stites recovered the email chain through its IT system.  Screenshots of portions of the email chain and invoice are set forth below:



| Reply | Reply All | Forward | Print | Read Transmission Body | View HTML Body |

| | |
|---|---|
| From | "Michels, James R." <randy.michels@stites.com> |
| To | "randy.michels@gmail.com" <randy.michels@gmail.com> |
| Subject | FW: Invoice from Eliza Brock Software, LLC |
| Date | 2014-11-11 at 23:30 |
| Attachments | ▶ Invoice_386_from_Eliza_Brock_Software_LLC.pdf |

From: Eliza Brock Software, LLC [donotreply@intuit.com]
Sent: Tuesday, November 11, 2014 10:09 PM
To: Michels, James R.
Cc: eliza@elizabrocksoftware.com
Subject: Invoice from Eliza Brock Software, LLC


Eliza Brock Software, LLC



Invoice Due: 11/25/2014
386
Amount:

$900.00



| | Eliza Brock Software, LLC<br>1711 Gale Lane<br>Nashville, TN 37212<br><br>(858)205-9285 | | Date | Invoice No. |
|---|---|---|---|---|
| | | | 11/11/2014 | 386 |
| Eliza Brock | | | Terms | Due Date |
| SOFTWARE | | | Net 14 | 11/25/2014 |

**Bill To**

James R. Michels
4141 Woodlawn Dr.
Apt. 29
Nashville, TN 37205

| Description | Quantity | Rate | Amount |
|---|---|---|---|
| **Charges**<br>• Project Planning and Wireframing for Trust Tree | 6 | 150.00 | 900.00 |

132.    Defendant Michels paid the Eliza Brock Software invoice on November 17, 2014 using his personal AMEX card.   A confirmation email was sent by Quickbooks to his Stites email account.   Sometime before he departed the firm, defendant Michels deleted this confirmation email from his Microsoft Outlook inbox and "deleted items" folder.   Stites recovered the email through its IT system.

133.    None of the above activities regarding the creation of "Trust Tree" had approval from the firm.   These activities occurred while defendants Michels, Ferrell, and Hartley were still holding themselves out as loyal fiduciaries and agents of the firm and collecting compensation and benefits from the firm.

134.    During the months leading to his departure, and while already preparing to launch his new company, defendant Michels collected expense reimbursements from the firm, even expenses related to the creation of the new entity.

135.    Defendant Michels obtained reimbursement from Stites for a lunch with the graphic designer (Holly Stewart) that defendants consulted to create the Trust Tree graphics.

136.    Defendant Michels obtained reimbursement for more than $3500 in travel expenses for a trip to a convention of the International Trademark Association (INTA) in Phoenix, Arizona the week of November 11-15, 2014.

137.    The substantial amount of time that defendants Michels, Ferrell, and Hartley spent preparing to launch a separate competing entity was to the exclusion of work actually done to benefit the firm and was in violation of the fiduciary and employment duties of the individual defendants.

138.    During their period of disloyalty, defendants held themselves out to third party service providers as a legal entity independent from Stites.

139.   On November 11, 2014, defendant Ferrell signed a non-disclosure agreement with an advertising consultant at Love and Science LLC.  Defendant Ferrell signed the agreement on behalf of "TRADEMARKOLOGY ('TM')", an entity that does not exist independent of Stites. Below are screenshots of portions of that agreement:

# MUTUAL NON-DISCLOSURE AGREEMENT

This Agreement, is by and between LOVE AND SCIENCE, LLC ("L+S") and TRADEMARKOLOGY ("TM").

**Whereas,** L+S and TM desire to share information between their respective companies.

**Whereas,** L+S and TM desire to memorialize the terms and conditions of their arrangement.

IN WITNESS WHEREOF, the parties have affixed their signatures on the date first above written.

LOVE AND SCIENCE, LLC

BY:_____
Aimee Romero, Founder

TRADEMARKOLOGY

BY: _____

140.   Trust Tree Legal, P.C. was incorporated on December 9, 2014 by defendant Hartley nearly a month before defendants Michels and Ferrell left Stites.

141.   The investigation of these facts is ongoing, however, based on the above information it appears evident that the actions of defendant Michels from January 2-6, 2015 to hijack the Stites

Trademarkology™ social media accounts were pre-planned and undertaken with the cooperation, assistance, and coordination of the other defendants.

## COUNTS

142.   Stites incorporates by reference and hereby realleges as if fully set forth herein, the above paragraphs for each of the following Courts.

### Count 1 – Preliminary Injunctive Relief Pending Dispute Resolution

143.   Section 13.1 of the Amended and Restated Operating Agreement of Stites & Harbison PLLC sets forth dispute resolution provisions applicable to disputes between Stites and its members.   That section provides:

> 13.1   Dispute Resolution.
>
> 13.1.1 Waiver.   EACH   MEMBER   KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES ANY RIGHTS HE, SHE OR IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED HEREON, OR ARISING OUT OF, UNDER, OR IN CONNECTION WITH, THIS AGREEMENT OR ANY COURSE OF CONDUCT, COURSE OF DEALING OR STATEMENTS (WHETHER VERBAL OR WRITTEN) RELATING TO THE FOREGOING. THIS PROVISION IS A MATERIAL INDUCEMENT FOR THE PARTIES HERETO TO ENTER INTO THIS AGREEMENT.
>
> (a)   Mediation.   If a dispute arises between the Firm and any Member arising out of or in connection with this Agreement, including any question regarding its existence, validity or termination that cannot be resolved by negotiation, the parties agree that, prior to making any demand for arbitration or initiating any other proceeding, the parties will attempt to resolve the dispute by mediation. Mediation shall be limited to one session unless the parties agree to hold additional sessions. The parties shall mutually appoint a mediator within 15 days after either party requests mediation by written notice to the other, and if the parties cannot agree on a mediator within such time, each party shall within 5 days thereafter submit a list of three qualified mediators, and the parties shall alternately strike one name from the list until only one name remains, and that person shall be appointed as the mediator. The party who strikes the first name shall be determined by lot. The mediator shall be a person who (i) offers mediation services

generally to the public, (ii) has received formal training in dispute resolution by mediation, (iii) is knowledgeable and experienced in the area of commercial transactions, and (iv) has successfully mediated (i.e., the parties to the mediation resolved their dispute without further proceedings) no fewer than three commercial disputes involving amounts in controversy in excess of $ 500,000. The mediation session shall be conducted as soon as practicable after the mediator has been appointed, but not more than 30 days after such appointment and acceptance thereof by the mediator, unless the parties and the mediator agree in writing to a later time. The mediation shall be held in Louisville, Kentucky or at such other place as may be mutually acceptable to the parties. Each party shall bear its own expenses incurred in connection with the mediation and each shall pay 50% of the costs, fees and reasonable expenses of the mediator.

(b)     Arbitration.  Should mediation fail to resolve such dispute, it shall be settled by arbitration under the Rules of the American Arbitration Association for Commercial Disputes (the "Rules") (as modified by this Section 16(c). The number of arbitrators shall be one (1) if all parties to the dispute agree on the arbitrator.  If there is a disagreement on selection of a sole arbitrator, the number of arbitrators then shall be three (3),with the arbitrators to be appointed in accordance with the Rules from a panel of arbitrators in Louisville, Kentucky.   The place of arbitration shall be Louisville, Kentucky or such other place as the parties to the dispute shall agree in writing.  The arbitration proceedings shall be conducted in the English language, and the arbitral award shall be rendered in writing in the English language and shall state the reasons for the award.  Judgment upon the award rendered by the arbitrator or arbitrators may be entered in any court having jurisdiction thereof, and shall be binding on the parties hereto.  The costs of arbitration, including reasonable legal fees and costs, shall be borne by either or both of the parties in whatever proportion as the arbitrator or arbitrators may award.

144.   As departing members of Stites, defendants Michels and Ferrell are subject to the dispute resolution obligations under Section 13.1 of the Amended and Restated Operating Agreement of Stites & Harbison PLLC.

145.   Stites is entitled to temporary and preliminary injunctive relief during the period of attempted dispute resolution to compel return of the Stites Trademarkology™ social media accounts to their state prior to the departure of defendant Michels.  Stites seeks injunctive relief

(1) compelling return of control of the social media accounts, (2) compelling return of the accounts to their original display content and domain addresses, and (3) prohibiting defendants from access or use of the accounts during the pendency of attempted dispute resolution.

146.    Stites has invoked Section 13.1 of the Amended and Restated Operating Agreement of Stites & Harbison PLLC by demanding that Defendants participate in alternative dispute resolution with regard to this matter.

147.    Stites seeks judgment in this Court for permanent injunctive relief against Defendants. And, to the extent that Defendants refuse to participate in alternative dispute resolution, alternative dispute resolution among all parties fails, or alternative dispute resolution is waived by the parties, Stites reserves its right to seek additional relief against Defendants.

### Count 2 – Kentucky Law Breach of Fiduciary Duty

148.    Defendants Michels and Ferrell were members of Stites with fiduciary duties to the firm under Kentucky common law and KRS Ch. 275, as well as the firm's operating agreement. These duties include the duty of loyalty, the duty of faithfulness, the duty of care, the duty of fair dealing, the duty to devote their full professional time and effort toward the advancement of the firm, the duty not to steal from the firm, the duty not to compete with the firm while a member, the duty of candor, and the duty not to destroy or impair firm property.

149.    The duty of full service is further emphasized in "Section 6.1 Devotion Primary to Professional Services." That section provides, "Each Member shall devote his or her best efforts to serving professionally the Firm and its clients.  Except as otherwise specified herein, each Member shall devote all of his or her normal business time to such services."

150.    By the letter agreement preceding his withdrawal, defendant Michels reaffirmed his fiduciary duty to cooperate post-withdrawal with respect the transition of firm affairs and to not take firm property.

151.    The conduct of defendants Michels and Ferrell detailed above constitutes breaches of fiduciary duties owed to Stites.

152.    As a direct and proximate result of these breaches, Stites has suffered, and will continue to suffer until such breaches are ended and cured, immediate and irreparable harm.

153.    Unless these breaches are enjoined, Stites will suffer irreparable harm for which there is no adequate remedy at law.

## Count 3 – Aiding and Abetting Breach of Fiduciary

154.    Defendants Hartley and Trust Tree Legal, P.C. knowingly participated in, and otherwise aided and abetted defendants Michels and Ferrell in breaching their fiduciary duties owed to Stites.

155.    As a direct and proximate result of the actions of Defendants, Stites has been and is being irreparably harmed.

## Count 4 –  Federal Service Mark Infringement

156.    Defendants' use of the Stites Trademarkology™ Mark and associated graphic mark and the STITES & HARBISON PLLC® mark in connection with the hijacked Stites Trademarkology™ social media accounts (and the embedded content of those accounts) to promote defendants' services is likely to cause confusion, mistake, or deception as to the origin, sponsorship, or approval of defendants' service or deception as to affiliation, connection, or association between Stites and defendant.

157.    Defendants' acts described herein infringe Stites's service marks and irreparably harm Stites, Stites' business, reputation, and goodwill.

158.    Unless enjoined by this Court, defendants will continue to infringe Stites's marks, and will continue to harm Stites and Stites's business, reputation, and goodwill, thereby causing continuing irreparable harm to Stites.

159.    Defendants' unauthorized use in commerce of Stites's marks in a manner that suggests an affiliation or endorsement of defendants or their services has caused, is likely to cause, and will continue to cause confusion, mistake, and/or deception as to the origin, sponsorship, or approval of defendants' services, and deception as to affiliation, connection, or association between Stites and defendants, and constitutes service mark infringement in violation of Section 32(a) of the Lanham Act, 15 U.S.C. § 1125(a).

<u>**Count 5– Unfair Competition Under the Lanham Act**</u>

160.    As a result of defendants' actions in hijacking and refusing to surrender control of the Stites Trademarkology™ social media accounts, and then deceptively altering the content and contact information of the accounts and using them to divert viewership and promote the business of Trust Tree Legal, P.C. while continuing to display the Stites trademarks, defendants have pervasively promoted and advertised their new business in a manner that is deceptive and likely to confuse viewers to the detriment of Stites, thus constituting unfair competition under the Lanham Act.

161.    Defendants actions' have caused, and will continue to cause, irreparable harm to Stites and its business, reputation, and goodwill, and will continue to cause irreparable harm unless and until this Court enjoins the illegal acts.

162.    Stites's remedy at law is inadequate.  Stites is entitled to an Order transferring control of the five Trademarkology™ social media accounts from defendants back to Stites.

163.    Defendants' intentionally wrongful acts have caused Plaintiffs to lose control over the reputation and goodwill associated with Stites Trademarkology™ Marks, the Stites

Trademarkology™ social media accounts, and Stites's business.   Defendants' acts have prevented Stites from maintaining and using accounts that Stites previously used and otherwise would use in connection with providing its brand of services to the public.  Defendants' acts have misappropriated the goodwill Stites.

164.   Defendants' wrongful acts alleged herein are willful and render this an exceptional case.

### Count 6 – Kentucky Unfair Competition

165.   Defendants' use of the Stites Trademarkology™ Marks and the STITES & HARBISON PLLC® mark in connection with the hijacked Trademarkology™ social media accounts (and their embedded content) or any other advertisement or promotion of the defendants' services constitutes a false designation, description, and representation in commerce tending to cause confusion, mistake, or deception or otherwise create the false impression that defendants are affiliated with, sponsored, or approved by Stites, or that defendants' services originate with, or are sponsored or approved by Stites.

166.   The willful actions of defendants constitute violations of the common law of the Commonwealth of Kentucky.

167.   As a direct and proximate result from defendants' actions, Stites has suffered irreparably harm.

168.   Unless these actions are enjoined, Stites will suffer irreparable harm for which there is no adequate remedy at law.

### Count 7 – Kentucky Common Law Tortious Interference with Existing Contract and Prospective Business Expectancies

169.   The Stites Trademarkology™ social media accounts were an instrument of communication with Stites's current and prospective clients and promoted the services of Stites.

170.   Defendants maliciously, intentionally, knowingly, improperly, and without justifiable cause interfered, and continue to interfere, with the business relations and expectancies between Stites and its existing and prospective clients by hijacking the Stites Trademarkology™ social media accounts and deceptively altering their content.

171.   As a direct and proximate result of the actions of defendants, Stites has been harmed continues to suffer irreparable harm.

### Count 8 – Kentucky Common Law Conversion

172.   Defendants knowingly and intentionally converted, interfered with, and misused the Stites Trademarkology™ social media accounts and other intellectual property for the benefit of defendants.

173.   Stites has demanded that defendants return this property, but defendants refused and continue to refuse to do so.

174.   Defendants' improper use and possession of the Stites Trademarkology™ social media accounts and other intellectual property have resulted in serious interference with Stites' interests in the materials and constitute conversion under Kentucky common law.

175.   As a direct and proximate result of these wrongful activities, Stites has suffered irreparable harm and, unless defendant is permanently enjoined and directed to return these materials to Stites, Stites will continue to suffer irreparable harm for which there is no adequate remedy at law.

### Count 9 – Kentucky Common Law Civil Conspiracy

176.   The individual defendants, and through the use of the legal entity the they formed and control, conspired and otherwise acted in concert through intentional and unlawful means to accomplish a common unlawful purpose as set forth in the Counts 1-8 above.

177.     As a direct and proximate cause of these actions, Stites has been and is being irreparably harmed.

## PRAYER FOR RELIEF

WHEREFORE, Stites prays:

178.     That this Court enter a judgment that Defendants' conduct violated Stites's rights under the federal Lanham Act and Kentucky law.

179.     That this Court grant temporary, preliminary, and permanent injunctive relief compelling Defendants to return control of the five Stites Trademarkology™ social media accounts to Stites, compelling defendants to return the accounts to their original display content and web addresses, enjoining Defendants from further unauthorized access or use of the accounts.

180.     That this Court enjoin Defendants, their agents, employees, servants, successors, and assigns, and all other person acting in concert, participation or combination with Defendants from using all designations confusingly similar to, or identical to, Stites's Trademarkology™ Marks or the STITES & HARBISON PLLC® mark in any manner, including any mark or designation that includes those marks, including advertising, promoting or selling any product or service in any advertisement, web site, circular, sign, label or other media form in connection with Defendants' services.

181.     That this Court require Defendants to remove from keywords, metatags, or other source code for Defendants' various websites and any and all references to the Stites's Trademarkology™ Marks or the STITES & HARBISON PLLC® mark or any other confusingly similar designation.

182.     That this Court require Defendants to pay Stites' reasonable attorneys' fees and costs.

183.     That this Court grant Stites such other and further relief as it should deem just and proper.

184.    Stites has reason to believe based on prior correspondence from Defendants that unless restrained, Defendants will commit additional breaches of fiduciary duty other than those outlined in Counts 2 & 3 of this Complaint, including disparagement, defamation, and misrepresentations concerning Stites. Therefore, Stites requests that this Court enter a prospective injunction prohibiting Defendants from committing such breaches of fiduciary duty.

185.    In the event that Defendants do not agree to comply with the dispute resolution obligations under Section 13.1 of the Amended and Restated Operating Agreement of Stites & Harbison PLLC, Stites reserves the right to amend this Complaint to seek all other appropriate relief.

<div style="margin-left:40%">

Respectfully Submitted,


/s/ *Edward H. Stopher*
Edward H. Stopher
Raymond G. Smith
Todd P. Greer
BOEHL, STOPHER & GRAVES, LLP
400 West Market Street, Suite 2300
Louisville, KY 40202
Telephone: (502) 589-5980
Fax : (502) 561-9400
estopher@bsg-law.com
rsmith@bsg-law.com
tgreer@bsg-law.com

Charles J. (Mike) Cronan IV
STITES & HARBISON PLLC
400 West Market Street, Suite 1800
Louisville, KY  40202-3352
Telephone: (502) 587-3400
Email: ccronan@stites.com

COUNSEL FOR PLAINTIFF
STITES & HARBISON PLLC

</div>